**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PETER SUNG OHR, REGIONAL DIRECTOR, OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) ) | No. 15-CV-8885 |
| Plaintiff, | ) | Judge Amy J. St. Eve |
| v. | ) ) | |
| ARLINGTON METALS CORPORATION, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("Union") filed unfair labor practice charges with the National Labor Relations Board ("NLRB") against Defendant Arlington Metals Corporation ("AMC"). Plaintiff NLRB has filed a petition seeking interim injunctive relief pending the final disposition of the administrative proceeding under 29 U.S.C. §160(j) ("Section 10(j)"). After considering the entire record, including the testimony and proceeding before the Administrative Law Judge ("ALJ"), the Court denies Plaintiff's petition for the following reasons.

## BACKGROUND

### I.      Events Leading To The Negotiations At Issue

AMC is an Illinois corporation engaged in the business of steel slitting and blanking. Specifically, AMC's business involves two operations: toll processing and metal sales. (R. 20, Admin. Rec., at 47-58.) In toll processing, AMC buys steel coils from steel mills, cuts them

according to the mills' customer-specifications, and collects a "tolling fee." (*Id*. at 58.) In metal sales, AMC buys steel from steel mills, cuts the metal according to AMC's customer-specifications, and sells the metal to its customers. (*Id*. at 51-56.) Toll processing comprises about eighty percent of AMC's business while metal sales comprise approximately twenty percent. (*Id*. at 85.)

On October 10, 2007, the Union won a certification election and became AMC employees' exclusive collective-bargaining representative serving the following people:

> All full-time and regular part-time production, maintenance, and shipping and receiving employees employed by the Employer [AMC] at its facility currently located at 11355 Franklin Avenue, Franklin Park, Illinois; but excluding office clerical employees and guards, professional employees and supervisors as defined in the Act.

(R. 20-1, Admin. Rec., at 173; R. 20, Admin. Rec., at 125-26.) The Union assigned the AMC employee representation to the United Steel Workers Amalgamated Local 7773 ("Union")[1]. (R. 20, Admin. Rec., at 124.) At that time, the Union represented 52 unit employees. (*Id*. at 125.)

Soon afterward, AMC's business began to suffer, in part, from the December 2007 national recession. (*Id*. at 397; R. 20-1, Admin. Rec., at 303.) In 2006, AMC processed 201,867 tons of steel with 52 unit employees, reaping a $1,229 profit. (*Id*. at 535.) Each number would steadily decrease from 2007 to 2011. Indeed, in 2010, AMC only processed 126,912 tons of steel with 24 unit employees, losing $452,170. (*Id*.) Ultimately, from 2007 to October 5, 2011, AMC lost $3,399,024. (*Id*.)

AMC-Union negotiations began in November 2007. (*Id*. at 130.) Throughout 2007 and most of 2008, the parties reached a number of agreements regarding non-economic issues. (*Id*. at 130-31; 136.) In late 2008, however, the parties began negotiating economic issues. (*Id*. at 131-

---

[1] The Court refers to the international and local unions collectively as the "Union."

32.)  In 2009, AMC, still suffering from the recession, withdrew a previous wage increase proposal.  (*Id*. at 437-38; R. 20-1, Admin. Rec., at 303.)  Instead, AMC proposed its "Last Best and Final Offer:" a wage cut and 180,000-ton-steel-processing benchmark for increasing the unit employees' wages.  (*Id*. at 438.)  In May 2009, the Union rejected AMC's offer.  (*Id*. at 371.)  In August 2009, however, AMC declared that the parties were at an impasse and unilaterally implemented its proposal.  (*Id*. at 132, 369.)  Specifically, AMC stated that,

> [t]he Company [AMC] will re-store [sic] the wage rates in effect immediately prior to the effective date of this Agreement if in the 12 month period immediately following the effective date of this Agreement the Company processes 180,000 tons of steel.
>
> The Company [AMC] will pay each employee a lump sum bonus on or around the 30th month following the effective date of this Agreement, if during the second full year of this Agreement the Company [AMC] processes 180,000 tons of steel. Such lump sum payment will be equal to 1% of the employee's previous year's lowest base wage multiplied by 2080.

(R. 20-1, Admin. Rec., at 264, 371.)

The ALJ concluded that by January 2012, AMC and the Union had met at least thirty-five times to, in part, negotiate these economic issues.  (R. 20-2, Admin. Rec., at 141.)  Specifically, the parties met nine times between April 2011 and December 2011 to negotiate changes to AMC's 2009 unilateral wage implementation.  (*Id*.)  In December 2011, however, AMC again declared that the parties were at an impasse.  (R. 20, Admin. Rec., at 363.)  As a result, in January 2012, AMC again unilaterally implemented employment terms and conditions, in part, setting the same 180,000-steel-ton threshold for wage increases.  (*Id*. at 132-33.)  In March 2012, while the parties made some progress, they could not agree upon new wage terms and conditions.  (*Id*. 455-58.)  In June 2012, the Union attempted to meet and bargain with AMC, and AMC declined, declaring that the circumstances had not changed and the parties remained at an impasse.  (*Id*. at 458-59.)

In July 2012, an AMC employee petitioned for an election to decertify the Union as the employee's exclusive bargaining representative. (*Id*. at 134, 459.) The Union won that election and was re-certified. (*Id*. at 135.) In September 2012, the Union requested to meet and bargain with AMC regarding the 2012 unilaterally implemented wage terms and conditions. AMC declined, restating that the parties were at an impasse. (*Id*. at 139, 459.)

Accordingly, the Union filed unfair labor practice charges against AMC in 2013. (*Id*. at 139-140.) Specifically, the Union alleged that AMC had refused to bargain in good faith and illegally sponsored a decertification petition. (*Id*. at 140.) The parties eventually signed an informal settlement agreement on July 8, 2013. (*Id*. at 140-41; R. 20-1, Admin. Rec., at 229.) Without admitting to any National Labor Relations Act ("Act") violations, AMC agreed to meet and bargain with the Union in good faith and allow Union representatives access to its facilities to investigate health and safety concerns. (R. 20-1, Admin. Rec., at 229-32.) In addition, the settlement agreement extended the Union's certification for one year. (*Id*. at 229; R. 20, Admin. Rec., at 141.)

## II.     September and October 2013 Meetings

On September 2013, the parties met to discuss AMC's discharge of the Union's steward and two employees' insurance issues. The parties also established a collective bargaining negotiation schedule. (R. 20, Admin. Rec., at 144-48; 463-65.) The parties agreed to meet on October 31, 2013 to begin negotiating. (*Id*. at 144, 148.)

On October 31, 2013, the Union negotiated for a new employee contract. Before issuing a new proposal, the Union provided AMC economic evidence illustrating how the employees had suffered since the 2009 and 2012 unilaterally implemented wage terms at issue. (*Id*. at 162.)

Specifically, the Union's "Economic Adverse Impact of AMC's Proposals on Employees" stated the following:

[1.]    Likelihood that employees will not receive a wage increase in 8 years.

[2.]    Employees suffered an approximate 90 cents per hour pay cut in 2009.

[3.]    The economic impact on employees due to inflation-cost of living alone from 2006 to 2013 results in over a 13% loss in earning power.

[4.]    The projected estimated loss in earning due to inflation-cost-of-living will result in an additional 4% loss in earnings if the employees do not receive a wage increase.

[5.]    The combined economic impact due to the cost of living on employee's earnings and spendable income will equal an estimated loss of over 17% or over $2.50 per hour.

[6.]    When the impact of the approximate 90 cent per hour pay cut is included the total earnings-income loss is over $3.40 per hour or over $7000 per employee per year on a straight time basis.

[7.]    When the economic adverse impacts of the group insurance premiums [set forth in the terms and conditions at issue] are considered there is an estimated loss of an average of over 30 cents per hour in premiums alone. This equals a combined loss of almost $4.00 per hour.

[8.]    When the out-of-pocket cost of the changed Health Care plan (HSA) is considered the cost could exceed $5000 per year or an additional $2.40 cents per hour.

[9.]    The total potential adverse impact of the Company's [AMC] proposal could equal an estimated *6.40 per hour loss to employees or over $13,000 per year*.

[10.]   The above numbers do not take into consideration that the Company [AMC] is experiencing an hourly labor cost savings of approximately *$3.67 per hour* as a result of the elimination of the rest break periods [set forth in the terms and conditions at issue].

(R. 20-1, Admin. Rec., at 275, emphasis in original.)

The Union subsequently gave AMC its eleventh economic proposal. (R. 20, Admin. Rec., at 159-60.) Overall, this proposal suggested that AMC change its healthcare plan, overtime

5

pay, vacation time, and wage calculations. (R. 20-1, Admin. Rec., at 277-78.) Particularly, with regard to wages, the Union's proposal recommended the following changes:

  a. Re-storing [sic] wages previously in effect: a mathematical formula to be
     establish [sic] to reflect production per employee that is equal to the 180,000
     ton average per year based on the average per capita employee count over a
     more current 12 month period based on a representative employee head count.
     When the equivalent tonnage per employee is reached on the average over a
     consecutive (12) twelve month period the wages previously in effect before
     the Company [AMC] reduced such wage rates to be restored-reinstated and
     replace those currently in effect in addition to any wage increases provided
     herein . . .

  b. Effective upon ratification each bargaining unit employee will be given a
     $1000 lump sum payment within seven (7) days following ratification.

  c. Effective 1/1/14:   A general wage increase of 35 cents per hour.

  d. Effective 1/1/15:   A general wage increase of 40 cents per hour.

  e. Effective 11/1/15: A general wage increase of 3%.

(*Id.*) The Union argued that AMC should base its wage increases on per capita steel production, rather than absolute production. The Union highlighted that AMC had processed 180,000 tons of steel in one year on only six occasions over a sixteen-year period. (*Id.* at 325, 408; R. 20, Admin. Rec. at 91-92.) In 2002 and 2006, the last two occasions in which AMC reached that benchmark, AMC employed 54 unit employees, meaning each employee produced about 3,333 tons of steel in a year's time. (*Id.*; R. 20, Admin. Rec., at 212-13.) Meanwhile, the Union argued, the most recent AMC production—116,208 tons of steel with 26 unit employees— showed that each employee processed 4,469 tons of steel, constituting a 40% per capita increase. (*Id.*) In sum, stressed the Union, the 180,000-ton absolute threshold was unrealistic and unfair. (R. 20, Admin. Rec., at 206-07, 397.)

AMC disagreed.  (*Id*.)  Anchoring its response on the dour market conditions and increased competition, AMC argued that its steel volume was down; its costs and taxes, up; and its demand and prices, down.  (*Id*. at 202-03, 226-27.)  Further, AMC argued that its steel mill competitors were stripping AMC of its customers and moving business outside of Illinois.  (*Id*. at 202-203)  Despite these grim conditions, AMC contended, it continued to pay fixed wages and benefits, make payroll every week, and maintain positive employee morale and high employee retention.  (*Id*. at 399-400.)  Finally, AMC responded directly to the Union's arguments against the absolute threshold: the steel production was related to operating costs and business performance, not profits and losses, and the company's wage calculus differed from the Union's.  (*Id*. at 201-02.)

Next, the parties debated AMC's ability to pay the wage increases at issue. The Union highlighted that AMC had cut labor costs nearly in half by decreasing the number of unit employees.  (*Id*. at 205-06, 398-99.)  Thus, the Union asked whether AMC was profitable and whether it could afford the wage increases.  (*Id*. at 203.)  In response, AMC continued to focus on the poor market conditions and explained to the Union that business had never recovered after dropping between 2010 and 2013.  (*Id*. at 202-03.)  Specifically, however, AMC stated that it was not claiming an inability to afford the Union's wage proposals.  (*Id*. at 203, 398.)  Instead, argued AMC, the company simply had a right to maintain its profit and loss information privately.  (*Id*.)

The Union then attempted to compromise with AMC.  Although the Union preferred an hourly wage increase, it offered to, instead, accept a $1,000 lump sum payment for each unit employee along with the rest of the proposed changes.  (*Id*. at 204.)  The company agreed to take

the Union's proposal under consideration, and the parties recessed from the meeting. (*Id*. at 204, 400.)

Upon returning to the meeting, AMC reported that the company's owners had rejected the Union's proposal. (*Id*. 205, 400-01.) AMC reiterated that the market fundamentals had not changed since 2009. (*Id*. at 433.) AMC stuck to its "Last Best and Final Offer." (*Id*. at 205-07, 400-01.) On November 11, 2013, AMC offered to compromise. AMC stated that it would accept one of the Union's unpaid time-off proposals on a limited basis but reject the remaining proposals, including the wage offers, as unacceptable. (*Id*. at 407; R. 20-1, Admin. Rec., at 279.) The unilaterally imposed AMC terms remained.[2] (R. 20-1, Admin. Rec., at 279.) The parties scheduled their next collective-bargaining meeting for December 11, 2013. (R. 20, Admin. Rec., at 403.)

## III.    December 11, 2013 Meeting And Information Production Request

At the December 11, 2013 meeting, the Union requested economic and financial data from AMC. (*Id*. at 171.) Specifically, the Union requested, in relevant part:

> Based on the Company's position, representations and explanation as to why it cannot agree to the Union's economic proposals and why the Company cannot rescind pay cuts and grant pay increases and other economic improvements to bargaining unit employees, the Union is requesting the following financial and economic information to be provided as soon as possible: . . .

---

[2] AMC's November 11, 2013 letter to the Union stated the following, in relevant part:

> Arlington Metals has considered the proposal you presented at our meeting on October 31st.

> The Company will accept your proposal for unpaid time off for union business, but with the following limitations: it would apply to only one person for a maximum of 20 hours per year.

> The remaining proposals are not acceptable because they are not reasonable given the state of the business. Arlington Metals stands on the current Implemented Terms.

> We are available to discuss at our next meeting or you can contact me sooner if you prefer.

(R. 20-1, Admin. Rec., at 279.)

[1]] Audited financial statements for the past four years. These should include complete balance sheets, income statements, and statements of cash flow together with footnotes and detailed supporting schedules. Supporting schedules should include cost of goods sold, including breakdowns of material costs, manufacturing overhead/burden, labor costs and supervisory, management, Company officers and other non-labor wages and benefits; and selling, general and administrative expenses. . . .

[2]] [T]he following financial reports: [d]etailed income statement; [d]etailed Balance Sheet; [s]tatement of Cash flows[.] These reports should cover Actuals for 2010, 2011, 2012 and financial reports year to date 2013. . . .

[3]] Sales by customer for each of the last four years, [and] current and projected for the next 3 years. . . .

[4]] A detailed explanation of the business conditions the Company is referring to and the specific changes that have occurred and the actual impact on the Company's financial condition. Provide specific data, reports and analyses. . . .

[5]] Federal and State tax returns the Company filed for the last four years.

(R. 20-1, Admin. Rec., at 283-84.) AMC suggested that most of the information was irrelevant, as they had not claimed an inability to pay the wage increases. (R. 20, Admin. Rec., at 409, 412.) Subsequently, the Union attempted to find a more reasonable wage increase framework. In support of its request, the Union emphasized that unit employees were processing more steel per employee than the years when AMC processed 180,000 tons total. AMC countered that the unilaterally imposed terms and conditions were fair, as evidenced by the lack of employee turnover. (*Id*. at 228-29; 412.) AMC then underscored the weak market conditions and suggested that the Union sign AMC's final offer at issue. (*Id*. at 212-13.) At this point, the December 11, 2013 meeting ended. (*Id*. at 214-15; 409-10.) Instead of amending its proposed changes to AMC's final offer, the Union awaited AMC's response to the production request. (*Id*.) A back-and-forth email match ensued.

On December 16, 2013, AMC responded to the Union's production request. (*Id*. at 412-413; R. 20-1, Admin. Rec., at 285-86.) AMC denied the Union's first and second requests,

refusing to produce its audited financial reports for the last four years and associated documents, its income statements, its balance sheets, and its statements of cash flow. (R. 20-1, Admin. Rec., at 285.) Specifically, AMC stated that "[t]he Union is not entitled to such information . . . because AMC has never asserted a financial inability to meet the Union's wage demands." (*Id.*) AMC did, however, partially oblige the Union's third request for sales information, providing tonnage and revenue data from 2009 through November 2013.[3] (*Id.*) This information only included tonnage and revenue data from AMC's toll processing and not its metal sales. (R. 20, Admin. Rec., at 96-97.) Additionally, AMC partially answered the Union's fourth request for a detailed explanation of the business conditions to which AMC had referred throughout negotiations. AMC asserted that "[t]he Union is not entitled to the detail and breadth of financial information requested," and disclosed recent and projected steel tonnage processing figures, claiming it was responsive to the Union's request.[4] (R. 20-1, Admin. Rec., at 286.) Finally, AMC denied the Union's fifth request for AMC's federal and state tax information, stating that "[t]he Union is not entitled to such information[.]" (*Id.*)

On January 7, 2014, the Union replied. (R. 20, Admin. Rec., at 414-15; R. 20-1, Admin. Rec., at 288-89.) Regarding AMC's refusal to accommodate the Union's first, second, fourth, and fifth requests, the Union stressed:

> In effect AMC's consistent basis for pay cuts and its position for not being able to provided [sic] future economic improvements, including wage increases, are premised on what has been described by AMC as deteriorating business conditions and a reduction in sales and the margins of such sales. AMC has clearly expressed this position and reason for its position regarding economic matters during negotiations, [sic] In effect, AMC is claiming a financial inability to pay or provide economic improvements for its employees. Therefore the

---

[3] Specifically, the tonnage and revenue data illustrated that AMC processed 100,854 tons of steel and $2,887,096 of revenue in 2009; 126,912 tons and $3,437,535 in 2010; 121,008 tons and $3,228,358 in 2011; 121,071 tons and $3,311,920 in 2012; and 106,471 tons and $3,007,027 by November 2013. (R. 20-1, Admin. Rec., at 285.)

[4] Specifically, AMC processed 121,071 tons of steel in 2012; 106,469 tons through November 2013; and anticipated processing 113,011 tons by the end of 2013. (R. 20-1, Admin. Rec., at 286.)

> Unions [sic] request for the Company's financial information is not only
> appropriate but necessary for the process of good faith negotiations to take place
> regarding economic matters.
>
> . . .
>
> [As for AMC's response for the Union's fourth request,] "[t]he Company's reply
> is not responsive and does not specifically provide the information requested.

(R. 20-1, Admin. Rec., at 288-89.)  Further, the Union requested that AMC supplement its

answer to the Union's third request for sales information.  (*Id*.)  Specifically, the Union asked

AMC to provide "itemized costs (clearly broken down for each expense) of the sales revenues

for each of the periods referred to" in its original request.  (*Id*. at 289.)

On January 9, 2014, AMC countered.  (R. 20, Admin. Rec., at 414-15; R. 20-1, Admin.

Rec., at 287-88.)  AMC reiterated that it has "never asserted an inability to pay as reason for any

of its proposals or rejection of the Union's proposals."  (R. 20-1, Admin. Rec., at 287.)  Instead,

AMC declined to provide more information.  (*Id*.)  AMC echoed the dismal market conditions,

concluded that its answers were responsive, and reasserted that the Union was not entitled to the

extra information it requested.  (*Id*.)

About three weeks later, on January 31, 2014, the Union restated its requests.  (R. 20,

Admin. Rec., at 414-15; R. 20-1, Admin. Rec., at 291-93.)  In essence, the Union argued that the

financial information was necessary and relevant, because "[t]he Company's position has and

was actually based on 'inability to pay.'  While the Company has not used those specific terms,

the reason and basis for the Company's position as expressed during the bargaining and actions

taken are the same—'inability to pay.' "  (R. 20-1, Admin. Rec., at 292.)

On February 3, 2014, AMC retorted: "We have considered each of your requests, and we

can detect no new justifications or plausible rationale that merit any different response that [sic]

we provided to you January 9, 2014 and December 16, 2013.  With all due respect, you are

11

simply repeating yourself." (R. 20, Admin. Rec., at 414-15; R. 20-1, Admin. Rec., at 291.)

AMC again contended that the Union was not entitled to any financial information beyond what

AMC had already produced. (R. 20-1, Admin. Rec., at 292.) In the end, AMC concluded that

the Union's "purpose [was] more about creating mischief than engaging in purposeful

communication." (*Id.*)

The Union sent its last reply on February 5, 2014. (R. 20, Admin. Rec., at 414-15; R. 20-

1, Admin. Rec., at 290.) Specifically, the Union claimed that AMC's February 3 response

illustrated the company's effort to "ignore the facts and the statements made during our

negotiation regarding Arlington Metals business performance and conditions and the statements

expressed by you as the basis and premise for the Company's position regarding economic

issues." (R. 20-1, Admin. Rec., at 290.) Finally, the Union reaffirmed that the financial

information at issue was necessary "for the Union to carry out its performance and duties as the

exclusive bargaining representative of the bargaining unit employees of Arlington Metals." (*Id.*)

On the same day, AMC ended the extended email exchange. (*Id.*) According to AMC,

the company had "never asserted an inability to pay for any position AMC has taken since 2007,

it has never been inferred, despite [the Union's] effort to say otherwise." (*Id.*) AMC concluded

that it had given the Union the information to which it was legally entitled and reminded the

Union that AMC's offer was final. At this point, the parties' collective bargaining negotiations

ended. (*Id.*)

## IV. Withdrawal of Recognition Petition

On July 10, 2014, Timothy Orlowski, AMC's executive vice president, received a

document from one of AMC's employees, entitled "Petition to Remove Union As

Representative." (R. 20, Admin. Rec., at 104-106.) In relevant part, the document stated:

> The undersigned employees of Arlington [M]etals do not want to be represented by united still worker 7773 [sic], hereafter referred to as "union."
>
> Should the undersigned employees constitute 30% or more, but less than 50%, of the bargaining unit represented by the union, the undersigned employees hereby petition the National Labor Relations Board to hold a decertification election to determine whether the majority of employees also no longer wish to be represented by the union.
>
> In addition, should the undersigned employees constitute 50% or more of the bargaining unit represented by the union, the undersigned employees hereby request that our employer immediately withdraw recognition from the union, as it does not enjoy the support of a majority of the employees in the bargaining unit.

(R. 20-1, Admin. Rec., at 296-98, 340-42.) The petition at issue included 16 employees' handwritten names and signatures, dated July 9, 2014. (*Id.*) Mr. Orlowski recognized a number of the employee names and signatures in the petition, testifying at the April 2015 ALJ hearing that "I've known these guys for a long time. I've seen their signatures on a multitude of documents, and they looked good to me. . . . Several of them . . . looked legit." (R. 20, Admin. Rec., at 109-10.) He was not familiar with a few signatures of employees who had started at AMC in 2013, and he did not verify them with AMC's on-file employee signatures. (*Id.* at 113-14.) According to Orlowski and an AMC employee census, AMC employed around 26 unit employees at the time of the petition. (R.20-1, Admin. Rec., at 383, 417.)

> On July 10, 2014, AMC informed the Union about the petition, writing, in relevant part:
>
> Please find enclosed a petition dated July 9, 2014, signed by 16 members of the Arlington Metals Corporation bargaining unit, advising they no longer wish to be represented by the United Steelworkers [the Union] as their exclusive bargaining agent. The petition was in no way, directly or indirectly, initiated, supported or encouraged by Arlington Metals management. These 16 employees constitute well more than 50% of the bargaining unit of 24 employees . . . Arlington Metals will respect the desire of a majority of the bargaining unit of all, and consistent with federal labor law it withdraws recognition of the United Steelworkers union as the exclusive bargaining agent of the employees located in its Franklin Park plant effective immediately.

(*Id.* at 295.)

13

## V.      Union Request To Conduct A Health And Safety Inspection

From September to December 2013, the Occupational Health and Safety Association (OSHA) issued between eighty and one hundred citations to AMC, directing AMC to rectify health and safety matters by Spring 2014.  (R. 20, Admin. Rec., at 298-99.)  In July 2014, a few unit employees informed the Union that various safety issues still existed in AMC's plant.  (*Id*. at 291-93.)  On July 10, 2014, before receiving AMC's email regarding the withdrawal of recognition petition, the Union emailed AMC to schedule a health and safety inspection to assess AMC's compliance with OSHA's citations.  (*Id*. at 284-85.; R. 20-1, Admin. Rec., at 294.)

AMC denied the Union's request.  (R. 20-1, Admin. Rec., at 294.)  Specifically, AMC resent AMC's July 10, 2014 email concerning the withdrawal of recognition petition and asserted that the Union had no right to conduct a health and safety inspection.  (*Id*.)

## VI.     ALJ Decision

As a result of the events described above, the Union filed a number of unfair labor practice charges against AMC.[5]  (R. 20-2, Admin. Rec., at 138.)  Originally, on September 30, 2014, the NLRB consolidated these charges and set an ALJ hearing for November 17, 2014.  (Nov. 12 Hrg., Resp. Exh. 8.)  On November 3, 2014, however, the NLRB indefinitely postponed the ALJ hearing to supplement the complaint with additional charges.  (*Id*.)  The review Board rejected the NLRB's attempt.  (Nov. 13 Hrg. Tr. at 343-44.)  Subsequently, the NLRB issued the First Amended Consolidated Complaint on March 12, 2015, and AMC responded.  (R. 20-1, Admin. Rec., at 15.)  Later, the ALJ denied one AMC employee, Brandon DeLaCruz, from intervening in the case.  (R. 18-1 at 33-35.)  On April 27 and 28, 2015, the ALJ held a hearing.  (R. 20, Admin. Rec., at 231.)

---

[5] Specifically, the Union filed charges on February 10, 2014 in 13-CA-122273, on March 26, 2014 in 13-CA-125255, and on July 18, 2014 in 13-CA-133055.  (R. 20-2, Admin. Rec., 138.)

The ALJ issued a detailed opinion on July 23, 2015. (R. 20-2, Admin. Rec., at 138-76.) First, the ALJ concluded that AMC had violated Sections 8(a)(5) and (1) of the Act by constructively asserting an "inability to pay" and subsequently refusing to produce financial information to which the Union was legally entitled. (*Id*. at 156-64.) Second, the ALJ found that AMC had engaged in surface bargaining in 2013 with no intention of reaching an economic agreement with the Union, in violation of Sections 8(a)(5) and (1) of the Act. (*Id*. at 164-68.) Third, the ALJ declared that AMC's withdrawal of recognition against the Union was violative of the same sections. Specifically, the ALJ found that a causal relationship existed between AMC's unfair labor practices above and the July 2014 employee withdrawal of recognition petition. (*Id*. at 168-70.) In addition, the ALJ held that AMC did not verify the signatures on the petition at the hearing, thus failing to satisfy its burden of establishing by a preponderance of the evidence that the Union had in fact lost majority support. (*Id*. at 170-72.) Finally, because AMC's withdrawal of recognition was invalid, concluded the ALJ, AMC's refusal to cooperate with the Union's health and safety inspections also violated Sections 8(a)(5) and (1) of the Act. As a result, the ALJ ordered AMC to, in part, re-recognize the Union, bargain with the employee representatives in good faith, produce the requested financial documents, and cooperate with the health and safety inspections. (*Id*. at 174-76.)

Throughout September and October 2015, the parties have filed their post-hearing exceptions and arguments in the underlying case before the Board. (*Id*. at 180-430.) The administrative appeals process is currently pending.

## VII.   Section 10(j) Preliminary Injunction Hearing

The NLRB initially inquired as to AMC's position on Section 10(j) interim relief on August 28, 2014, but did not file a petition seeking such relief at that time. (Nov. 12 Hrg., Resp.

15

Exh. 8.)  On July 28, 2015, the NLRB raised the Section 10(j) issue with AMC a second time, but again elected not to file a petition.  On October 6, 2015, the NLRB filed a "Petition for Injunctive Relief" under 18 U.S.C. §160(j).  (R. 1.)  Specifically, the NLRB seeks to enforce the ALJ's order pending the final disposition of the Board's underlying administrative complaint. (*Id.*)  On October 29, 2015, AMC responded.  (R. 22.)

On November 12 and 13, 2015, the Court held a preliminary injunction hearing pursuant to Federal Rule of Civil Procedure 65 and 18 U.S.C. §160(j).  During the Section 10(j) hearing, the Court permitted the parties to supplement the testimony from the hearing before the ALJ. *See N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (instructing courts to evaluate Section 10(j) requests with "an eye toward the traditional equitable principles that normally guide such an inquiry") (quotation marks and citation omitted).  During the hearing, the NLRB called Frank Shubert as a witness.  Mr. Shubert is the Staff Representative and President for the Local 7773 Union.  Mr. Shubert first discussed the Union's monthly meeting structure and format. According to Mr. Shubert, the Union met on the second Sunday of every month to hold a general membership meeting followed by separate unit meetings.  Only members "in good standing" who signed a membership card were allowed to attend these meetings.  At most general membership meetings, the Union maintained an attendance log and the recording secretary kept minutes.  Mr. Shubert explained that the individual unit meetings were more informal and did not require attendance logs and minutes.  Generally, when the Union would discuss AMC-related matters, the topics covered a range of matters including, in part, employment terms and conditions, AMC's 2012 unilaterally implemented wage terms, contract negotiations, and alleged unfair labor practices.

Next, Mr. Shubert, in relevant part, verified a number of meeting attendance logs and minutes that illustrated a drop in AMC-employee union participation during the alleged unfair labor practices. Specifically, on September 29, 2013, the Union held a special meeting after the July 2013 informal settlement agreement. At least eighteen AMC employees attended the meeting, six of whom filled out membership cards to participate for the first time. Later, four AMC employees attended the Union's January 12, 2014 meeting, none of whom were the six new members from the September 2013 meeting. By the Union's April 13, 2014 meeting, two AMC employees attended, and none of the six new September 2013 members attended. At the Union's June 8, 2014 meeting, eight AMC employees attended, including some of the new September 2013 members, but the meeting ended without being adjourned when a number of them walked out. After the July 10, 2014 employee withdrawal of recognition petition, zero AMC employees attended the July 18, 2014 Union meeting. Ultimately, AMC employee attendance dwindled to two members on average during the year following the July 2014 withdrawal petition. Finally, on August 30, 2015, six AMC employees attended the Union's special meeting to discuss the ALJ's July 2015 decision.

The Court also admitted various redacted meeting minutes into evidence during the hearing. The Court has reviewed the unredacted versions of these documents ex parte and *in camera* and is satisfied that the NLRB appropriately redacted irrelevant information.

AMC called the following employee witnesses to testify at the hearing: Brandon DeLaCruz, Dallas Wright, Zdzislow Bajno, Casimir Waz (Casey), Chris Keiler, Anthony Menotti, Vincent Roldan, Emil Stezeck, Stanley Landowski, Michael Krasinski, Steve Hill, Andres Coronel, Brandon Trezzo, Joshua Arndt, and Joseph Carrisal. Counsel separate from AMC's counsel represented these employees. In sum, out of the ten employee signees who

AMC presented, nine employees testified that they signed the petition of their own volition, free from AMC input, threats, or rewards. The tenth petition signee, Brandon Trezzo, was unable to remember the events at issue. Each employee expressed some version of employee Brandon De La Cruz's sentiment: "I feel I don't need a union." (Nov. 12 Hrg. Tr. at 174.) AMC also called Tim Orlowski, AMC's Executive Vice President, to testify at the hearing. Mr. Orlowski testified, in relevant part, that AMC management played no role in organizing the withdrawal petition. Further, he explained that an injunction forcing financial data disclosure would damage AMC's privacy and success. The Court carefully observed and evaluated the demeanor of each witness on the stand.

In addition, the parties stipulated to the testimony of the following witness employees: Daniel DeLaCruz, Pedro Garcia, Chris Jasinski, Samuel Medrano, and Jesus Reyes. Specifically, the parties stipulated that "if called to testify, each of these witnesses would testify that they did not work at the company in July of 2014 when the petition was signed; that they currently work there; and, they do not wish to be represented by the Union." (Nov. 12 Hrg. Tr. at 288.) The Court notes that each of these employees was present, represented by counsel, and ready to testify.

**LEGAL STANDARD**

"Under [Section] 10(j) of the [National Labor Relations] Act, courts may grant temporary injunctions pending the Board's resolution of unfair labor practice cases."[6] *Harrell ex rel.*

---

[6] Section 10(j) of the Act (29 U.S.C. §160(j)) states:

> The board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

*N.L.R.B. v. Am. Red Cross, Heart of Am. Blood Services Region*, 714 F.3d 553, 556 (7th Cir.

2013). This relief "is intended to protect a union pending the Board's remedial action." *Id*.

Indeed, "[S]ection 10(j) directs district courts to grant relief that is 'just and proper[.]' " *Ohr ex*

*rel. N.L.R.B. v. Latino Exp., Inc.*, 776 F.3d 469, 472 (7th Cir. 2015) (citation omitted). "Interim

relief is 'just and proper' when four factors are present: (1) NLRB has no adequate remedy at

law; (2) the Union will be irreparably harmed without interim relief, and that potential harm to

the Union outweighs potential harm to the employer; (3) public harm would occur without the

relief; and (4) the Board has a reasonable likelihood of prevailing." *Am. Red Cross*, 714 F.3d at

556 (citing *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011)); *see also*

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499-500 (7th Cir. 2008) ("The court looks to

the same factors to which it looks in other contexts when deciding whether to grant injunctive

relief[.]").

      "The Director bears the burden of establishing the first, third, and fourth of these

circumstances by a preponderance of the evidence." *Spurlino Materials*, 546 F.3d at 500 (citing

*Bloedorn v. Francisco Foods, Inc.*, 276 F.2d 270, 286 (7th Cir. 2001)). "The second prong,"

however, "is evaluated on a sliding scale: The better the Director's case on the merits, the less its

burden to prove that the harm in delay would be irreparable, and *vice versa*." *Id*. (citing

*Bloedorn*, 276 F.3d at 286-87). For each prong, the Director must "surpass the 'possibility'

threshold into 'likelihood[.]' " *Barker v. A.D. Conner, Inc.*, 807 F. Supp. 2d 707, 718 (N.D. Ill.

2011) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365,

375, 172 L. Ed. 2d 249 (2008) ("[T]he . . . 'possibility' standard is too lenient. Our frequently

reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable

injury is likely in the absence of an injunction.")). This "likelihood" standard requires more than

a "mere possibility of relief" and more than a "better than negligible" showing. *A.D. Connor, Inc.*, 807 F. Supp. 2d at 719 (quoting *Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749, 1762, 173 L. Ed. 2d 550 (2009) (discussing similar standards for issuance of stay)).

Importantly, "[a]n injunction granted under [S]ection 10(j) is an 'extraordinary remedy.' " *Irving Ready-Mix*, 653 F.3d at 570 (quoting *Bloedorn*, 276 F.2d at 297). Indeed, relief under Section 10(j) "should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process." *Id.*

## ANALYSIS

## I. Irreparable Harm And Adequate Remedy At Law

The NLRB argues that the Union and AMC unit employees face "irreparable harm." Specifically, the Union contends that "failure to order immediate preliminary injunctive relief will only further erode employee support for the Union, deprive employees of the benefits of good faith bargaining and completely undermine employees' Section 7 rights guaranteed under the Act." (R. 1 at 8.) In light of the NLRB's delay, however, the Court disagrees.

To succeed in a Section 10(j) preliminary injunction proceeding, the NLRB must demonstrate that "the union will be irreparably harmed without interim relief." *Latino Exp., Inc.*, 776 F.3d at 472. According to the statute's drafters, "[t]he rationale behind [Section] 10(j) is that '[t]ime is usually of the essence[.]' " *McKinney ex rel. N.L.R.B. v. Southern Bakeries, LLC*, 786 F.3d 1119, 1122 (8th Cir. 2015) (quoting S. Rep. No. 80-105, at 8 (1947)). Indeed, "[t]he deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the

20

collective bargaining process." *See Spurlino Materials*, 546 F.3d at 501 (quoting *Electro-Voice*, 83 F.3d at 1573).

When the petitioner delays in seeking interim relief, however, it weighs against finding that the petitioner faces irreparable harm. *See Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979). Put differently, the petitioner's delay in seeking Section 10(j) relief implies that the petitioner does not believe "time is of the essence." Sen. Rep. No. 80-105, at 8 (1947); *see also Iximation, Inc. v. Switch Bulb Co., Inc.*, No. 14-CV-6993, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) ("Delay is a factor in assessing the existence of irreparable harm, and unexcused delay on the part of parties seeking extraordinary injunctive relief is grounds for denial of a motion because such delay implies a lack of urgency and irreparable harm.") (quotation marks and citation omitted). Here, AMC allegedly committed its last unfair labor practice on July 10, 2014 when AMC ceased recognizing the Union. The Board, however, did not file the current petition for Section 10(j) relief until October 6, 2015—approximately fifteen months after the event. This delay on the part of the NLRB supports that the unit employees' alleged injuries are neither urgent nor irreparable.

The Court acknowledges that "delay is only one among several factors to be considered[.]" *Ideal Indus.*, 612 F.2d at 1025. Importantly, however, a petitioner's delay is more than a "mere passage of time" when the petitioner delays knowing that the union it seeks to reinstate has been out of favor for an extended period of time. *Id.* at 1025 (stating that a "mere passage of time" alone cannot preclude petitioners from showing irreparable injury). Indeed, when "the party seeking injunctive relief has knowledge of the pending nature of the alleged irreparable harm," its delay further cuts against the likelihood of irreparable injury. *Iximtion*, 2014 WL 5420273, at *7.

The Eighth Circuit's opinion in *Southern Bakeries* is instructive. 786 F.3d 1119. In *Southern Bakeries*, the NLRB filed its petition for Section 10(j) relief seven months after the company withdrew recognition of the union and two years after the union had lost majority support. *See id.* at 1124-25. The court found that "[t]here [was] no indication in this case that allowing the ordinary adjudicatory process to run its course would significantly undermine the Board's ability to remedy the alleged unfair labor practices. . . . Because the Union had long been out of favor, when, if ever, [the employer] is ordered to recognize the Union, the Union would have to perform largely the same work to rebuild support from employees." *Id.* Put differently, administrative delay would cause no marginal harm to the Board's ability to effectively enforce the Act because said harm plateaued as a result of the petitioner's delay. Indeed, "[t]he Director must satisfy the court that the case presents one of those rare situations in which the delay inherent in completing the adjudicatory process will frustrate the Board's ability to remedy the alleged unfair labor practices." *Id.* at 1123. Under these circumstances, a preliminary injunction "did not act to preserve the status quo. Rather, it accelerated what at this point only may be the ultimate remedy." *Id.* at 1125. Thus, Section 10(j) "extraordinary relief" was inappropriate. *See id.*

The Court agrees with the reasoning in *Southern Bakeries*.[7] As described above, Section 10(j) interim relief "should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process." *Irving Ready-Mix*, 653 F.3d at 570. Here, the NLRB's knowledgeable delay threatened effective enforcement of the

---

[7] The Court acknowledges that the Eighth Circuit evaluates irreparable harm in the Section 10(j) context a bit differently than the Seventh Circuit. *See Southern Bakeries*, 786 F.3d at 1124, n. 6. Indeed, as described above, the Seventh Circuit assesses the "irreparable harm" and "success on the merits" factors on a "sliding scale. *Spurlino Materials*, 546 F.3d at 500. As the Court describes later, however, the NLRB's weakened likelihood of success below increases its irreparable harm burden. Thus, despite the difference between the two circuits, the Eighth Circuit's analysis is nonetheless relevant.

Act. The NLRB delayed filing the immediate Section 10(j) petition by nearly fifteen months. Moreover, it did so knowing that the Union was out of favor, as AMC notified them as such on July 10, 2014. Indeed, the NLRB directly raised the possibility of Section 10(j) relief with AMC in August 2014 and July 2015, but consciously chose not to seek such relief. Instead, the NLRB did not seek Section 10(j) relief until October 2015. The NLRB's knowledgeable delay implies that any harm the unit employees face is neither urgent nor exclusive to administrative delay. Indeed, if AMC is ultimately ordered to re-recognize the Union, the Union will face the same rebuilding hurdles regardless of how long the administrative process takes. *See Southern Bakeries*, 786 F.3d at 1125. Thus, time is not of the essence, and the NLRB has failed to show that the unit employees face irreparable harm.[8] Indeed, the normal administrative process which is well under way will constitute adequate relief rather than a judicially imposed "extraordinary remedy." *Irving Ready-Mix*, 653 F.3d at 570 (quotation marks and citation omitted). "This approach respects Congress' design that the Board initially decides the merits of labor disputes[.] . . . Granting a preliminary injunction in situations other than when the remedial purpose of the Act would be frustrated unless immediate action is taken . . . would effectively circumvent the normal N.L.R.B. processes established by the Act and muddle the proper allocation of administrative and judicial functions." *Southern Bakeries*, 786 F.3d at 1123-24.

## II. Reasonable Likelihood Of Success

As the Court described earlier, the Director bears the burden of establishing by a preponderance of the evidence that the Board has a reasonable likelihood of prevailing. *See*

---

[8] Holding otherwise would leave this Court's analysis vulnerable to a dilemma in which future petitioners, despite knowing of potentially impending "irreparable harm," could delay seeking interim relief, artificially enhancing their success on this factor given the Seventh Circuit's holding that collective bargaining harm and time are directly correlated, as described above. *See Spurlino Materials*, 546 F.3d at 501 (quoting *Electro-Voice*, 83 F.3d at 1573). Here, as the Court made clear at the hearing, there is no indication that either party acted in bad faith. (*See* Nov. 13 Hrg. Tr. at 322.) Objectively, however, the NLRB's fifteen-month knowledgeable delay implies that the harm was not irreparable.

*Spurlino Materials*, 546 F.3d at 500 (citing *Bloedorn*, 276 F.3d at 286). In assessing this factor, "it is not the district court's responsibility . . . to rule on the merits of the Director's complaint; that is the Board's province. The Court's inquiry is confined to the *probability* that the Director will prevail." *Bloedorn*, 276 F.3d at 287 (emphasis in original); *see also Electro-Voice, Inc.*, 83 F.3d at 1567 ("In the context of a [Section] 10(j) petition, a federal court has no jurisdiction to pass on the merits of the underlying case before the Board."). At this step, "[t]he court will give some measure of deference to the view of the ALJ in determining the likelihood of success." *Am. Red Cross*, 714 F.3d at 556 (citing *Bloedorn*, 276 F.3d at 288 ("The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.")); *see also Spurlino Materials*, 546 F.3d at 502-503.

### A. Surface Bargaining Without The Intention Of Reaching An Agreement

The NLRB asserts that it has shown a likelihood of success of establishing that AMC "engaged in bad faith and/or surface bargaining by, bargaining with no intent to reach agreement" from "about October 13, 2013 [sic], through December 11, 2013." (R. 1 at 6.) The ALJ's decision, however, was based on only two months of an almost seven year bargaining relationship, thereby weakening the NLRB's likelihood of success on the merits.

"Section 8(a)(5) of the Act places upon an employer the duty 'to bargain collectively with the representatives of his employees.' " *N.L.R.B. v. Overnite Transp. Co.*, 938 F.2d 815, 821 (7th Cir. 1991) (quoting 29 U.S.C. §158(a)(5)). "Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to 'interfere with, restrain or coerce employees' in the exercise of their rights 'to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted

24

activities for the purpose of collective bargaining or other mutual aid or protection.' " *Id.* at 819

(quoting 29 U.S.C. §§157, 158(a)(1)).  Put differently, these sections of the Act require that

employers bargain in good faith with employee representatives.  "The determination of whether a

party has bargained in good faith must be based upon the totality of the circumstances."

*N.L.R.B. c. Schwab Foods, Inc.*, 858 F.2d 1285, 1292 (7th Cir. 1988) (citing *UAW Local No.*

*1712 v. N.L.R.B.*, 732 F.2d 573, 578-79 (7th Cir. 1984)).  Indeed, "it is proper to determine

whether there has been good faith bargaining by examining the 'conduct of the parties as a

whole.' " *Int'l. Union, United Auto., Aerospace & Agric. Implement Workers of America, & Its*

*Local No. 1712 v. N.L.R.B.*, 732 F.2d 573, 578 (7th Cir. 1984) (quoting *N.L.R.B. v. Ins. Agents'*

*Int'l. Union*, 361 U.S. 477, 498, 80 S. Ct. 419, 4 L. Ed. 2d 454 (1960)).  "Isolated instances of

misconduct will not be viewed as a failure to bargain in good faith."  *Schwab Foods, Inc.*, 858

F.2d at 1292.

   The ALJ rested his findings upon two meetings out of at least thirty-seven total between

the Union and AMC.  This small slice of meeting times does not amount to assessing the

"totality of the circumstances."  *Id.*  Indeed, the ALJ concluded that

> Respondent's [AMC] overall conduct during the bargaining that occurred in 2013
> violated Section 8(a)(5) and (1) of the Act.  Examining the entirety of the
> Respondent's conduct during this time period, I find that it did not have a sincere
> purpose to find a basis for an agreement[.]

(R. 20-2, Admin. Rec., at 165.)  Based on his opinion, the ALJ explicitly limited his focus to the

October 31, 2013 and December 11, 2013 meetings and found that AMC "indicated a complete

unwillingness to consider the Union's proposal[.]"  (*Id.* at 167.)  Despite acknowledging that the

"parties had approximately 37 collective-bargaining sessions between November 2007 and

December 2013; that the parties reached a tentative agreement on the noneconomic provisions of

a collective-bargaining agreement; and that in 2013 the Respondent [AMC] made a minor

25

compromise," the ALJ narrowly tailored his reasoning and conclusion to two 2013 meetings, stating that "when I consider the totality of the of the Respondent's [AMC] conduct in bargaining during 2013, it convinces me that the Respondent [AMC] did not bargain in good faith in 2013[.]" (*Id*. at 167-68.) The holding, based on just two meetings, undercuts the "totality of the circumstances" analysis. *Schwab Foods, Inc.*, 858 F.2d at 1292. Failing to substantively consider nearly ninety-five percent of the other negotiation meetings reduces the ALJ's likelihood of success.

### B. Withdrawal Of Recognition

Next, the NLRB contends that they have shown a likelihood of success in establishing that AMC illegally "withdrew its recognition of the Union as the exclusive collective-bargaining representative of the Unit." (R. 1 at 6.) Given the ALJ's reasoning, however, the NLRB's likelihood of success on the merits is decreased.

First, the ALJ concluded that a "causal relationship existed between the Respondent's [AMC] unfair labor practices and the petition received by the Respondent [AMC] on July 10, 2014[.]" (R. 20-2, Admin. Rec. at 170.) "[T]herefore," the ALJ held," the Respondent [AMC] cannot rely on that petition to assert that the Union no longer enjoyed majority status as of that date." (*Id*.) Specifically, the ALJ directly tied AMC's "bargaining in bad faith" to "employee disaffection from the Union." (*Id*. at 169.) As described above, however, the ALJ failed to consider the "totality of the circumstances" in concluding that AMC had engaged in bad faith bargaining. *Schwab Foods, Inc.*, 858 F.2d at 1292. Thus, the ALJ's narrow factual considerations weaken both his "bad faith bargaining" finding and "tainted petition" finding built upon it.

Second, the ALJ found that AMC "ha[d] not established by a preponderance of the evidence that the Union, had, in fact, lost majority status on July 10, 2014" and concluded that AMC "violated Section 8(a)(5) and (1) of the Act by withdrawing recognition from the Union." (R. 20-2, Admin. Rec., at 171.) In reaching this holding, the ALJ relied on the fact that AMC never introduced evidence to support the petition's validity: "The Respondent [AMC] did not call any employees to testify that they solicited signatures or signed the petition. The Respondent also did not introduce any personnel records with the employee signatures in order for me to compare the signatures on the petition to signatures contained within the Respondent's [AMC] regular business records." (*Id.*) The only evidence AMC introduced in support of the petition's validity was Mr. Orlowski's testimony. The ALJ found this testimony unsatisfactory: "Timothy Orlowski's [sic] admitted at the trial that he was not very familiar with the signatures of . . . some of the other newer employees. . . . I find that [his] uncorroborated testimony can only establish the authenticity of 10 of the 26 signatures on the petition[.]" (*Id.*) As a result, the ALJ held that AMC had failed to satisfy its burden of establishing that the Union had indeed last majority support.

The administrative record, however, weakens the ALJ's findings. As AMC noted at the hearing, the Board repeatedly confirmed that it was not challenging the validity of the petition. Prior to the ALJ's April 2015 hearing, the Board opposed an AMC employee's intervention, stating that "the Complaint does not allege any violation with regard to the 'validity' of the employee petition and, in particular any actions carried out by employees in preparing the petition or presenting it to [AMC]." (R. 18-1, Ex. A.) Further, the Board repeated this position during the ALJ's hearing. Specifically, the ALJ recognized that nothing in the complaint directly challenged the petition. The Board agreed: "I am not challenging the petition. I am challenging

the fact that . . . [AMC] did not check the signatures. Pretty much that's it." (R. 20, Admin. Rec., at 111.) Finally, in its appellate briefs in the underlying administrative proceedings, the Board reaffirmed four days before petitioning this Court for Section 10(j) interim relief that "[t]he Complaint does not allege any violation with regard to the 'validity' of the employee petition." (R. 20-2, Admin. Rec., at 389.) At the ALJ's hearing, however, the NLRB argued that AMC had "acknowledged that prior to the withdrawal of recognition it did not authenticate the signatures on the petition." (R. 20, Admin. Rec., at 22.) Given the NLRB's position prior to the hearing, AMC was never notified that it would need to establish the petition's validity at the April 2015 hearing. Had it been, AMC may have called as witnesses the myriad of employee signees who testified at the November 2015 Section 10(j) hearing to authenticate the petition and satisfy the burden, if any, the Act imposes. Instead, the NLRB's shifting stance toward the petition's validity resulted in a lack of relevant evidence before the ALJ and, accordingly, deprived AMC of the opportunity to present further evidence. The ALJ did not have the opportunity to examine the demeanor or review the testimony of any of the employees before ruling on the petition's validity. Consequently, the ALJ's likelihood of success suffers.[9]

### C.      Refusal To Allow Health And Safety Inspection

Finally, the NLRB argues that it has shown a likelihood of success in establishing that AMC has violated the Act by "refus[ing] to allow the Union access to its Franklin Park, Illinois, facility for the purpose of performing a health and safety inspection." (R. 1 at 6.) In light of the errors above, however, the likelihood of success for the ALJ's finding diminishes.

---

[9] Interestingly, the NLRB's November 2014 attempt to supplement the original complaint, described above, included a challenge to the petition's validity. The review Board dismissed this charge, and it was not included in the consolidated charges the ALJ considered at the April 2015 hearing. (Nov. 13 Hrg. Tr. at 343-44.)

The ALJ found that "[s]ince the only basis for the Respondent's [AMC] refusal to grant the Union reasonable access to its facility in order to conduct a health and safety inspection was its reliance on its withdrawal of recognition on July 10, 2014, the Respondent [AMC] has violated Section 8(a)(5) and (1) by summarily rejecting the Union's request for a healthy and safety inspection." (R. 20-2, Admin. Rec., at 172.)  The ALJ concluded that AMC's refusal to allow the inspections was faulty, as its withdrawal was based on an invalid petition.  For the same reasons that the ALJ's related petition findings are weakened, as described above, so too are his inspection findings.

### III.  Public Harm

Another "interest at stake in a [Section] 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process.' " *Am. Red Cross*, 714 F.3d at 557 (quoting *Bloedorn*, 276 F.3d at 300).  The collective bargaining process is built upon the employee rights established under 29 U.S.C. §157.  In relevant part, "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing[.]" *Id*.  Importantly, these statutory rights also include "the right to refrain from any or all of such activities[.]" *Id*.

At the heart of this case lies an inquiry as to what the AMC unit employees want, resulting in a tension between these two rights.  It is not the Court's role, however, to relieve this tension.  Instead, the Court's mission is to preserve the "integrity of the collective bargaining process." *Am. Red Cross*, 714 F.3d at 557.  Doing so requires using the preliminary injunction factors as a litmus test for collective-bargaining procedural integrity.  If a petitioner satisfies these factors, the facts warrant an "extraordinary remedy," and the Court can preserve procedural integrity by providing it under Section 10(j).  *Irving Ready-Mix*, 653 F.3d at 570 (quotation

marks and citation omitted).  If, however, the petitioner does not satisfy each factor, the Court preserves procedural integrity by denying such interim relief and allowing the underlying administrative process to proceed.  Here, the NLRB has failed to successfully demonstrate that the AMC unit employees face irreparable harm, in part, due to its own knowledgeable delay. Similarly, the Board has not shown a strong likelihood of success in light of the errors at the ALJ proceeding described above.  Given the "sliding scale" on which these two factors operate, the underlying opinion's reduced likelihood of success enhances the NLRB's irreparable harm burden.  *Spurlino Materials*, 546 F.3d at 500 (citing *Bloedorn*, 276 F.3d at 286-87.)  The NLRB has failed to satisfy this burden.  In sum, this case does not present facts that warrant the extraordinary injunctive remedy.  Thus, to preserve collective-bargaining procedural integrity, the Court denies the NLRB's petition for Section 10(j) interim relief and allows the administrative process to proceed on the merits.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's Section 10(j) petition for a preliminary injunction.

**DATED:  December 1, 2015**

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge